IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Current Communications Group,      )
LLC, *et al.*,                     )
                                   )
                Plaintiffs,        )    Case No. 1:05-CV-385
                                   )
     vs.                           )
                                   )
Current Media, LLC, *et al.*,      )
                                   )
                Defendants.        )

Order Denying Motion for Preliminary Injunction

A. The Parties

     1. Plaintiffs

     The Plaintiffs are Current Communications Group, LLC;

Current Technologies, LLC; and Current Communications Services,

LLC (collectively "Plaintiff").  Plaintiff's business is

providing broadband internet access through electric power lines,

as opposed to dial-up, DSL or cable internet access.  The acronym

for Plaintiff's services is "BPL" - "broadband over power line."

In order to provide BPL to customers, Plaintiff must partner with

a local utility company.  In this case, although Plaintiff has

been developing the technology for several years, at the present

it is only providing BPL service in the Cincinnati area through

Cinergy.  Plaintiff presently has only 2,100 customers here.

Plaintiff also has test sites for BPL in Maryland.  Plaintiff's

Chairman has testified about plans to provide BPL service in

Dallas and Hawaii.  Those projects, however, still seem to be in the embryonic stages.

Plaintiff plans to provide VoIP ("voice over internet protocol") services as well.  VoIP permits the use of the internet as a telephone service.  Presently, however, Plaintiff has only about 100 VoIP customers.

Finally, Plaintiff says it plans to provide video to clients through its BPL service.  Allegedly, the consistent transmission speed of BPL (as compared with the varying uploading and downloading speeds that plague DSL and cable) makes it an ideal medium to access video information.  Thus, Plaintiff envisions itself as a medium through which consumers could access movies and similar media.  This aspect of Plaintiff's business, however, still appears to be in the planning stages.  Plaintiff does not actually offer this service at this time.

Plaintiff holds four trademarks from the PTO - "CURRENT COMMUNICATIONS," "CURRENT BROADBAND," "CURRENTREFERRAL," AND "CURRENTLINK."  Plaintiff has also submitted applications to register approximately nine additional marks containing the word "Current."  Finally Plaintiff has websites under the domains current.net, currenttechonologies.com, and currentgroup.com.

    2. The Defendants

The Defendants are Current Media, LLC, and Current TV, LLC (collectively "Defendant").  Defendant was formed by Joel Hyatt

2

and Al Gore to "democratize" television. Distilled to its essence, Defendant's idea is to make television an interactive experience. Part of its appeal is that viewers will be able to produce their own video pieces and then upload them to Defendant's website (currenttv.com). Then Defendant will broadcast the pieces over the air after appropriate editing and cosmetic production treatment. Conversely, viewers will be able to download content from the website as well. To be sure, however, it is an actual cable television network. Defendant's target audience is the "young, media savvy internet generation." Joel Hyatt testified that he came up with the name Current TV while skiing with his son in Utah. The network is scheduled to go live on August 1, 2005. Defendant claims that if it is enjoined from using "Current TV" it will have virtually no programming to put on the air (all of its logos, etc., have already been incorporated into its programming), the network will "go dark" - i.e., stop broadcasting. It will then default on its leases, be compelled to cease business, and investors' contributions of $75 million will be lost.

B. The Claims

Plaintiff asserts claims for trademark infringement and unfair competition pursuant to the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a). Plaintiff also asserts claims under Ohio law

for unfair competition, trademark infringement, and deceptive trade practices.

C.  Standard of Review

The Court must consider four factors in deciding whether to issue a preliminary injunction: likelihood of success on the merits, the likelihood that irreparable harm will result from the Court's refusal to issue an injunction, the harm to others, and the public's interest in granting an injunction.  The test is a balancing of factors with no one factor being dispositive.  The Court, however, should not issue a preliminary injunction where there is no likelihood of success on the merits or irreparable harm.  Gonzalez v. National Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000); Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 103 (6th Cir. 1982).

D.  Analysis

1.  Success on the Merits

In order to succeed on a claim of trademark infringement, the plaintiff must establish likelihood of confusion among consumers regarding the origin of the goods offered by the parties.  Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 280 (6th Cir. 1997).  In assessing the likelihood of success on the merits the Court should consider

4

the following factors: 1)  the strength of the senior mark; 2) relatedness of the goods or services; 3) similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels used; 6) likely degree of purchaser care; 7) the intent of the defendant in selecting the mark; and 8) the likelihood of expansion of the product lines.  Id.  "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely and not all of these factors may be particularly helpful in any given case."  Data Concepts, Inc. v. Digital Consulting, Inc., 150 F.3d 620, 624 (6th Cir. 1998) (internal ellipses omitted).

        a. strength of the marks

    Plaintiff argues that its marks are strong because of the trademark registrations, the alleged millions of dollars it has spent marketing its marks, the media attention its ISP service has garnered, its alleged significant customer base, and the alleged thousands of public inquiries it has received about its services.  Defendant argues that Plaintiff's marks are not strong.  Defendant argues that the marks are only generic (lowest in the hierarchy of fanciful, suggestive, descriptive, and generic) and has not acquired secondary meaning.  Defendant notes that hundreds of third parties use the word "current" in their marks.

5

The Court need not resolve the specific place in the trademark hierarchy where Plaintiff's marks fall in order to resolve this matter.  However, the Court concludes that Plaintiff has correctly characterized its marks as suggestive, rather than descriptive or generic as Defendant characterizes it.

Even though Plaintiff's marks are presumptively strong, their strength is undermined by the fact that Plaintiff has not widely advertised them.  The evidence presented at the hearing did not demonstrate that Plaintiff's marks are well-known among the general population.  Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 632 (6th Cir. 2002).  Plaintiff's claim that it has invested millions of dollars promoting its marks is suspect. Defendant argues that the advertising dollars spent are more in the range of $300,000 of the $5.1 million in advertising expenses claimed on the marketing and promotion spreadsheet submitted by Plaintiff (Doc. No. 26, Ex. A).  It appears that approximately $3,000,000 of this sum is for salaries and expenses, apparently for persons involved with developing the technology.  That leaves only about $2,000,000 that could be considered advertising expenses.  Plaintiff's chairman, William Berkman, appeared to agree that the Plaintiff's marks are not well-known in areas where it does not offer service.  Berkman Dep. at 181-82. Finally, during the hearing, Mr. Berkman testified that Plaintiff had only engaged in advertising in a "targeted fashion."

6

Plaintiff has done some direct mail advertising and door-to-door advertising, but has not done any television, radio, magazine, or newspaper advertising.

Finally, Defendant is correct that a mark is weakened where there is third party use of the mark. <u>Data Concepts</u>, 150 F.3d at 625. Defendant has submitted evidence of hundreds of users of "current" in their marks.

In sum, although based on a preliminary record, it appears that Plaintiff's marks are not strong. It does not appear that Plaintiff has extensively advertised its marks and Plaintiff admits that the marks are not well-known outside of the limited area where it provides service. Additionally, the fact that a large number of third parties use "current" in their marks dilutes the strength of Plaintiff's marks.

b. <u>relatedness of the goods and services</u>

In this case, at the present time, the parties' goods and services are not related or only tangentially related. Plaintiff provides broadband internet service. It has plans to offer video access and VoIP service. These projects, however, are still in the development stage. Defendant, on the other hand, is a television network that does not provide internet access, video, or VoIP service. During the hearing, Mr. Hyatt testified that Defendant has no plans to provide any of these services and in fact is contractually precluded by the cable and satellite

7

networks from simulcasting or webcasting its network over the internet.

> If the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely. Kellogg Co. V. Toucan Golf, Inc., 337 F.3d 616, 624 (6th Cir. 2003). "The relatedness inquiry therefore focuses on whether goods and services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company."

AutoZone, Inc. V. Tandy Corp., 373 F.3d 786, 797 (6th Cir. 2004).

The parties in this case are not direct competitors. Nor is it likely that they will become direct competitors. The only connection between the two parties' goods and services is that Defendant's TV network will rely on viewers submitting videos for programming and the viewers will require a broadband internet service to interact with the network. Plaintiff posits a theory in which a Current Communications ISP customer will access the Current TV website to download information and become confused about the sponsor of the information, but this seems far-fetched given the relative paucity of its broadband subscribers. See generally, Therma-Scan, Inc., 295 F.3d at 629 (provider of diagnostic thermal imaging examinations and seller of thermometers did not sell related goods). This factor does not favor Plaintiff.

c. similarity of marks

Defendant has presented exemplars of how each party uses "current" in its logos in the marketplace.  Doc. 26, at 19-20.  A side-by-side comparison "is not the test" for similarity of marks.  Rather, the marks "must be viewed in their entirety and in context [and a] court must determine, in light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." Data Concepts, Inc., 150 F.3d at 626.  It is the overall impression of the mark, not an individual feature, that counts.  Homeowners Group, Inc. v. Home Marketing Spec., Inc., 931 F.2d 1100, 1109 (6th Cir. 1991).

> [T]he relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies. Daddy's Junky Music Stores, 109 F.3d at 283 (noting that "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark"(internal quotation marks and citation omitted); see also Homeowners Group, 931 F.2d at 1109 ("A court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented")(internal quotation marks and citation omitted).  As such, a detailed analysis of specific features of a trademark is not appropriate; rather, "courts must view marks in their entirety and focus on their overall impressions, not individual features."

Therma-Scan, 295 F.3d at 633.

9

In this case, the overall impression of the two marks is that they are similar.  The predominate feature of both marks of course is the word "current."  Both parties' marks are in lower case letters, although the fonts are different.  Defendant's mark is patterned in blocks which are reminiscent of a crossword puzzle and is followed by an underscore mark which invokes the image of a word processing cursor.  Plaintiff's mark appears to be in the Arial font and is accompanied either by an image of an electrical plug or a circular symbol or ring with three buttons on it.  The ring and buttons logo is also suggestive of electrons circling the nucleus of an atom.  Additionally, in Plaintiff's mark the word "current" is emphasized in larger typeface with the remainder of the mark, i.e. "broadband", appearing below "current" in smaller type face.  Although there clearly are differences in the marks, the lowercase typeface coupled with the predominance of the word "current" in both marks creates an overall impression of similarity between the marks.  This factor favors Plaintiff.

d. <u>actual confusion</u>

There is no evidence of actual confusion among consumers although Plaintiff discounts this factor because as of the time of the hearing, Defendant had not yet launched its network.  <u>See</u> <u>TCPIP Holding Co., Inc. v. Haar Comm., Inc.</u>, 244 F.3d 88, 102 (2nd Cir. 2001)("[B]ecause Haar has not yet launched its portal

10

in a serious way, there has been little or no opportunity for actual confusion to be manifested.  As a result, the absence of evidence of actual confusion sheds no light whatever on the problem.").  Defendant argues that there has been opportunity for actual confusion because it has had some high-profile publicity for its network.  Absence of actual confusion is inconsequential unless evidence of actual confusion should have been available.  PACCAR, Inc. v. Telescan Tech. L.L.C., 319 F.3d 243, 252 (6th Cir. 2003).  Despite the media attention which Defendant's television network has garnered, the Court is not convinced that evidence of actual confusion should have been available.  Accordingly, the Court concludes that this factor plays no role in this case.

> e. the marketing channels used

Plaintiff argues that both parties are targeting "internet savvy" consumers and that the internet will be a substantial marketing channel for both parties.  Defendant argues that it markets itself to advertisers and cable and satellite service distributors and that Plaintiff markets itself to users of broadband internet services.  In other words, according to Defendant, the parties have two different customer bases.  Defendant also argues that generic use of the internet to market a product is insufficient to find that the marketing channels are similar.  See Therma-Scan, 295 F.3d at 637 ("Some use of the

Internet for marketing, however, does not alone and as a matter
of law constitute overlapping marketing channels. Instead, the
relevant questions include: (1) "whether both parties use the Web
as a substantial marketing and advertising channel," (2) "whether
the parties' marks are utilized in conjunction with Web-based
products," and (3) "whether the parties' marketing channels
overlap in any other way").  This factor favors Defendant because
the parties appear to have different target markets and because
generic internet use is not the equivalent of overlapping
marketing channels.  Plaintiff's target market consists of
individual subscribers of broadband, video, and VoIP services.
Plaintiff, however, has not really done much marketing of its
products at all.  Although viewers of Current TV can download
videos of its programming from the website, it appears that the
primary function of the internet for Defendant is that it is a
tool which allows its viewers to communicate with the network.
Plaintiff presently limits its advertising to direct marketing,
door-to-door advertising and word of mouth.  Defendant advertises
through mainstream media and some word of mouth resulting from
articles on the telecommunications industry in newspapers and
magazines.  Additionally, Defendant's sources of revenue are the
cable and satellite television distributors and advertisers.  No
evidence was presented that Defendant charges any fees to access
its website and Mr. Hyatt testified that viewers are not charged

12

to submit their videos to the network.  Although there is some
overlap in the marketing channels because of the internet, the
Court finds that the parties' marketing channels do not overlap
substantially.  Thus, this factor favors Defendant.

      f. <u>likelihood of purchaser care</u>

Generally, in assessing the likelihood of confusion to the
public, the standard used by the courts is the typical buyer
exercising ordinary caution.  However, when a buyer has expertise
or is otherwise more sophisticated with respect to the purchase
of the services at issue, a higher standard is proper.
Similarly, when services are expensive or unusual, the buyer can
be expected to exercise greater care in his purchases.  When
services are sold to such buyers, other things being equal, there
is less likelihood of confusion.  <u>Daddy's Junky Music Stores</u>, 109
F.3d at 285.

Plaintiff's expert testified at the hearing that in general
internet users exercise very little care online.  Defendant
contends that because it does not sell anything on its website or
from the station, it would be impossible for consumers to use
such little care as to be confused.  The Court notes additionally
that Defendant's target audience is the "internet savvy"
generation who are, judging from the video samples played during
the hearing, very technically proficient in using and producing
internet-based medium.  It seems to the Court as a matter of

simple logic that a generation which has come of age using the internet and which possesses the apparent technical acumen of Defendant's audience would be unlikely to confuse the parties' goods and services. Contrary to Plaintiff's argument, the Court does not believe that <u>PACCAR</u> established as a matter of law that internet users exercise little care. In fact, it is readily apparent that the <u>PACCAR</u> Court only affirmed the district court's findings, based on that record, that average internet users do not undertake a sophisticated analysis when searching for domain names. <u>PACCAR</u>, 319 F.3d at 253-54. Although the bulk of Plaintiff's customers are likely to be average internet users, Defendant's target audience is likely to be more sophisticated in their use of the internet. Nevertheless, because Plaintiff's consumers are likely to consist primarily of average users of the internet, this factor favors Plaintiff.

       g. <u>intent of the defendant in selecting the mark</u>

As noted, Joel Hyatt claims he came up with Current TV while skiing with his son. There is no prima facie indication of bad faith or copying, but Plaintiff claims that because of its registration of its trademark, Defendant was on constructive notice of its marks. Plaintiff has also adduced evidence that demonstrates that Defendant was on actual notice of its trademark registrations and that it ignored warnings from its counsel that its use of "Current" could raise infringement issues. The Court

14

perceives no evidence of bad faith, but notes that Defendant has been negligent in its selection of the mark without sufficient follow up investigation to reveal Plaintiff as a potentially aggrieved senior trademark holder. This factor favors Plaintiff slightly.

> h. likelihood of expansion of product lines

This, as Defendant correctly argues, is the cornerstone of Plaintiff's case. Plaintiff argues that it will be expanding to become a "triple play" provider of services.[1] Defendant argues that Plaintiff's triple play plans are speculative and that the parties' services are not likely to converge. "[A] strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." Big Daddy's Junky Music, 109 F.3d at 1109. In Big Daddy's, the Court found that there was at least an issue of fact on expansion where the plaintiff had entered into preliminary negotiations to purchase a chain of competing music stores. In this case, Plaintiff presented evidence that it is in negotiations with entities such as Starz to provide video access over the internet, but there seems to be no timetable for their conclusion and no prediction whether an agreement will be forthcoming in the near

---

[1]  A "triple play" provider is a provider of video, voice and data information.

future.  Plaintiff's VoIP service has an extremely limited customer base and there was no evidence that this Plaintiff would soon provide this service on a widespread basis.  Plaintiff currently has negotiations ongoing with a number of utility companies to provide BPL access, but again there was no evidence when these negotiations would conclude and when Plaintiff would be able to provide this service beyond its present limited geographic area.

In contrast, Defendant has adduced testimony, which is unrefuted, that it is contractually foreclosed from engaging in simulcasting or webcasting.  Thus Plaintiff's theory of convergence of the parties' products and services is significantly undercut.  As a practical matter, Defendant cannot presently compete with Plaintiff.

Plaintiff's expert has opined that convergence of various teleservices is a fact and implies that it represents an inexorable trend that will inevitably pit the parties against each other as competitors.  Defendant's expert opines that while convergence exists and can happen, it is not inevitable.  Indeed, he opines that the modern teleservices consumer enjoys the stimulation of multi-tasking.  That consumer would opt for a computer, separate telephone and separate television set all in the same room functioning at the same time.  While the Court has reservations about Defendant's expert's perception of this modern

16

consumer's preferences, we cannot say with any degree of certainty that either expert's opinion carries convincing weight.[2]

The Court concludes that Plaintiff does not have aspirations to produce and market either news or entertainment programming. Defendant has no plans to enter the ISP market or VoIP markets. Thus neither party appears to be clearly headed for a collision with the services presently contemplated by the other, and neither party appears capable of providing the other's services. For example, only Plaintiff could expand into the VoIP market by virtue of its status as an ISP. For the present, this factor favors Defendant.

     i.  <u>reverse confusion</u>

Plaintiff advanced a theory of "reverse confusion of sponsorship" in which the holder of the junior mark saturates the market with a similar trademark and overwhelms the senior user. <u>Therma-Scan, Inc.</u>, 295 F.3d at 630. The public then comes to assume that the senior user's products are really the junior user's products. The senior user loses the value of its trademark - product identity, control over its goodwill and

----

[2]     The Court will not strike Plaintiff's expert's testimony as requested by Defendant, because his opinions concerning the likelihood of convergence of services and, therefore, confusion as to origination of the Plaintiff's and Defendant's services was helpful, enlightening for the Court and as well-founded as the timing of the hearing and the subject matter would permit.

reputation, and ability to move into new markets. Id. It appears, however, that just labeling a case a "reverse confusion case" does not alter the analysis significantly. The ultimate issue is still whether likelihood of confusion will result. See id. at 641 (analyzing reverse confusion in the context of the eight factors listed above). In other words, while Plaintiff claims that it intends to expand into other product lines (a consideration under subpart h), Plaintiff still must establish a likelihood of confusion under the traditional analysis. However, the Court has ruled that, as to this hearing, the issue is not under consideration because it was not raised until Plaintiff's reply memorandum. Defendant had insufficient opportunity to respond to this claim.

       j. summary of factors

Plaintiff's strongest argument is that its marks are registered and therefore presumptively strong. Nevertheless, the strength of the marks is undercut because they have not been promoted extensively, because there is substantial third-party use of the word "current," and because Plaintiff's marks are not known outside of the limited area in which it presently offers broadband services. The parties' goods and services are not related or are only related in a tangential way. There is no evidence of actual confusion among consumers, but this factor has not been shown to be of consequence at this time. The marks are

18

similar.  The parties target different consumers and generic use
of the internet does not establish overlapping marketing
channels.  Defendant appears to have selected its mark in good
faith.  The Court assumes for purposes of this hearing that
internet consumers exercise little care.  It is speculative
whether the parties' product lines will converge.

In assessing the overall impact of the above factors, the
Court attributes more weight to the fact that the parties do not
offer related goods and services and to the fact that the parties
are not likely to offer the same products or services.  Trailing
slightly behind in the calculus is that the presumptive strength
of Plaintiff's marks are undermined by their relative anonymity
among consumers.  As indicated, Plaintiff's infringement case is
predicated on the convergence theory.  The evidence shows,
however, that the parties are not likely to be offering competing
products.  Moreover, at the present, Plaintiff provides broadband
service in a limited geographical area only, has almost no VoIP
customers, and provides no direct video access services.
Although Plaintiff's expansion into these lines may be
inevitable, the record suggests that such expansion is not
imminent.  Consumers cannot be confused about the origin of
services which neither party presently provides and which are not
related even when Plaintiff ultimately begins providing them.

19

Nor can consumers become confused when the parties are not likely to become competitors.

Thus, although some of the factors without question favor Plaintiff, the Court concludes that overall, Plaintiff has not established that consumers are likely to be confused regarding the origin of the parties' goods and services.  Therefore, the Court finds that Plaintiff is not likely to succeed on the merits of the case.

> 2. Irreparable Harm

A finding that Plaintiff is likely to prevail on the merits of its trademark infringement claim would establish the necessary irreparable harm.  Absent such a showing, however, there is no irreparable harm if an injunction does not issue.  At a minimum, Plaintiff would have to establish a "serious question" about the merits to justify an injunction here.  Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261, 1270 (6th Cir. 1985)("A finding that a party was not likely to prevail on the merits would not preclude a court from the exercise of its discretion to issue a preliminary injunction if the movant at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued.").  Here, the Court finds that Plaintiff has not raised a substantial question on the merits.  Nevertheless, even if Plaintiff had raised a substantial question

20

on the merits, the potential irreparable harm caused by infringement of its marks is reduced because the parties are not competitors.  See <u>Alltel Corp. v. Actel Integrated Comm., Inc.</u>, 42 F. Supp.2d 1265, 1274 (S.D.Ala. 1999)(risk of irreparable harm minimal given lack of current competition between parties). Finally, as explained below, risk of irreparable harm to Plaintiff is substantially outweighed by the harm that will occur to Defendant if the Court issues the requested injunction.

      3.  <u>Harm to Others</u>

    Of course, Defendant paints the issuance of a preliminary injunction as the death knell for its fledgling cable television channel that would dash the hopes and dreams of its founders, its partners and, most of all, its potential customers, who long to express themselves.  Plaintiff more obscurely suggests that it may suffer by association or comparison in its reputation and capital raising activities.  Clearly, loss of customers is unlikely, if not impossible, because the parties offer entirely different services.  Defendant has invested substantial assets and capital in producing programming which incorporates its mark and it cannot simply "erase" its logo and continue its broadcasts.  In fact, there are substantial practical and contractual obstacles with which Defendant would have to contend in order to proceed under a new network name.  These obstacles, if not fatal to the continued existence of the network, would be

21

particularly onerous to overcome.  Therefore, this factor favors the Defendant.

    4.   <u>The Public Interest</u>

    The public interest would favor protecting Plaintiff from trademark infringement.  Conversely, however, where, as is the case here, Defendant likely has not infringed upon Plaintiff's marks, the public interest would not favor injunctive relief. Therefore, this factor favors Defendant.

    5. <u>Conclusion</u>

    In conclusion, the balance of factors favors the Defendant. Plaintiff is not likely to succeed on the merits.  The risk of irreparable harm to Plaintiff is minimal and is outweighed by the harm that would befall Defendant if injunctive relief were granted.  The public interest does not favor injunctive relief in this case.  Accordingly, Plaintiff's motion for a preliminary injunction is not well-taken and is **DENIED.**


       **IT IS SO ORDERED**


Date <u>August 2, 2005</u>         <u>s/Sandra S. Beckwith</u>
                            Sandra S. Beckwith, Chief Judge
                             United States District Court